Okay, we'll call our next case Barry Boles v. Wal-Mart Stores, Inc. Mr. Hammer Mesh Mr. Hammer Mesh v. Wal-Mart Stores, Inc. When he first saw his doctor, she told him that if he kept his leg escalated and got west, she thought he'd be back at work in two weeks, correct? That's correct. It could have been two weeks. Correct. Maybe it should have been. But you've got a little problem here, and that problem is the standard of review that we have to apply. You have a jury verdict. Right. And I think the question is whether there was any – obviously the question is whether there was any evidence at this trial to support the various aspects of plaintiff's claim. Just to return a minute to your question, Judge Rendell, I agree the issue could have been raised more clearly. I think it was clearly raised as to the – I believe it's a discrimination claim that the jury ultimately rejected. Accommodation claim you mean? The other claim. I'm blanking on which one it was. It was accommodation. Okay. But where was protected activity either argued to the court or put before the jury? It probably wouldn't have been put before the jury, but was there any contention within the district court that this was not protected activity? Well, I think the same argument went to the protected activity issue, and more importantly I think the judge clearly understood that. The judge specifically addressed the indefinite leave issue in deciding the pre-verdict motion for judgment. Well, there's one sentence, if you will, that might seem to conflate the two. But I don't find in jurisprudence a tie-in between the case law that says a request for indefinite leave is not a reasonable accommodation. I don't find the tie-in between that jurisprudence and, oh, and by the way, protected activity, that relates at all to protected activity. Maybe you can tell me the case that says that that's probative of protected activity. Well, I think the question is whether the request, whether if a – in order to be a protected activity, I think it would have to be, in this case, a request for a reasonable accommodation. If in a request for indefinite leave, if indefinite leave isn't a reasonable accommodation, I don't think a request for indefinite leave. I don't think he requested that accommodation. Exactly. I'm sorry, I didn't. He didn't request an accommodation. Well, I think I did. He was taking leave under the family medical leave. Wrong. Period. It's not accommodation, it's statutory right. Correct. I mean, the family medical leave would have ended in July. Walmart, under its own policies, granted him additional leave until December. Is that a standard Walmart policy to grant paid leave for someone who had been on family medical leave? I think there is a family medical leave act policy and then a personal leave policy. And under the personal leave policy, if an employee can request medical leave beyond the family medical leave act, and then it's up to the managers whether to grant that or not. And that was the response to the email, why are we not terminating him? Because we have a policy that allows that. Correct. And significantly, that email, remember, came before his request for leave until September. Before he had finalized the paperwork. Correct. And money had been already suspended without pay. Correct. Although I would note that that pay was ultimately repaid to him in October after he didn't return from the leave. So why would we grant a new trial? We're not asking for a new trial, Your Honor. We're asking for judgment as a matter of law. Okay. Then, even more to the point, why would we grant that? Well, Your Honor, I think, again, he requested leave until September 10th, 2011. Walmart granted that until September 29th. There's no evidence that prior to September 29th. All right. Let's stop right there. Sure. Why did you then wait until October 27th to send him a letter to say he's terminated? Right. I don't have an answer from the trial record about why it took so long to send that letter, but I think it's clear from the record that they started the process to send that letter before he returned to work. This was only a nine-line letter. It doesn't take long to ponder this letter. And, in fact, to get the shift manager of the store to ponder that letter, it's surprising. It's confusing. And most significant to where we are, it lets the jury make whatever inference they thought was the proper inference that perhaps led them to the verdict that they arrived at. And here we are. You're asking us to reevaluate what the jury did. We can't do that. If the only evidence in the record, Your Honor, was that the letter was sent after he returned from work, then the jury might be able to make that inference. But I think the evidence was clear at trial. Well, it was. Well, I think the evidence was that that letter or that process was started before he returned to work. Well, the process may have been started, but he showed up on the 24th, and then he's fired for job abandonment a few days later. And the jury is kind of going abandonment. After he came back. He came back. I mean, you know, if you had sent this letter out in early October and said you were supposed to be back September 30th, we haven't seen you, you're hereby terminated. Yeah, and there's no evidence Wolvard tried to contact him during that period. There was testimony. I think it may have been contested, but there was testimony that Wolvard attempted. But his cell phone record showed that he got no calls. I mean, the point is, and my point in raising these factual questions isn't necessarily trying to pin you down on which fact is correct and which fact is incorrect. The purpose of raising the question is this got to the jury, and the jury arrived at a verdict. And, you know, we're not in the business, unless there is an heir of law, to say the jury was wrong. If I could, I guess we're trying to find out, at least I'm trying to find out, what it is you're saying is the heir that should entitle you to the judgment. Well, I think the heir is, and I'll address it briefly. I would like to turn to the attorney's fees issue also. You may. Pardon me? You may. Go ahead. You know, we laid out the case law, which we think was convincing about whether he needed to make a request for specific leave and indefinite leave, and whether the request of the doctor, was a request for leave. And I think it's significant that that case law wasn't contested by plaintiff in his brief. I'd like to turn briefly to the attorney's fees issue. The New Jersey test for attorney's fees is the same as the federal test. It was laid out in the Hensley case by the U.S. Supreme Court, and adopted in Rendine by the New Jersey Supreme Court. And that test has two parts. The standard lodestar analysis that I'm sure the court is familiar with, and second of all, the district court is obligated to consider whether the lodestar amount should be reduced if the plaintiff's claim is only partially successful. And I would submit that the district court here made a legal error in failing to recognize that plaintiff's claim was only partially successful. And there are two reasons I would say it was only partially successful. First of all, a plaintiff asserted five different claims in his complaint. Two of them were the same legal theory but different factual circumstances. And only one of those claims was successful at trial. After two years of discovery, extensive briefing on summary judgment, and a jury trial, only one claim was successful. Two were dismissed on summary judgment because they lacked any evidence. One was withdrawn voluntarily because the evidence at trial didn't support it. Were there really alternative claims? I don't think that's right, Your Honor. We laid out in our brief that the claims were factually distinct. For example, the FMLA claim turned on whether Wal-Mart had sent him the required notices, which would have happened in May and June. Success on those claims would likely not have led to a higher monetary award. I'd agree with that, Your Honor, but I think when you went to the front page, the district court already took the fees for the front page claim out. Well, Your Honor, they took, I think it's $18,000 out of $250,000 of fees for powers that were specifically attributable to the front page claim. It seems to me Hensley speaks really to this very issue. Prevailing parties succeed on any significant issue, and the court can reduce to account for limited success. This is an equitable judgment that the court has discretion.  whether to make an alternative legal grounds for a desired outcome, whether it's a good faith and they raise alternative legal grounds for desired outcome and the court's rejection of or failure to reach certain grounds isn't a sufficient reason. The result is what matters. It's a pretty heavy-duty result here. I think the next pair of words … Emotional and punitive. I appreciate that, Your Honor, but I think … I'll say that I know your time is up on this. Yeah, Mr. Harriman. But let me just ask one quick question. Sure. You also took a hit on punitive damages and that was charged to the jury and under the test has to be especially egregious conduct for there to be an award of punitives. Supposing we were to say, well, you know, there's nothing especially egregious here and we reverse the punitives, would we remand for redetermination of attorney's fees based on your success? I think you'd have to, Your Honor, because the fact that … I'm pretty sure that the fact that punitive damages were awarded was part of Judge Oleo's analysis in saying the plaintiff achieved an excellent result and was entitled to … She thought she used the phrase, you know, it was a very slender read on which to base the punitives. Right. And we did raise an issue about the punitive damages. Unless you have questions about that, I rely on my briefs and … All right. We'll have you back on rebuttal. Thank you, Your Honor. Okay. Mr. Page. Mr. Page, before you get started, you know, I sometimes have an opportunity to teach in law schools, talk about appellate advocacy, try to caution the students not to use strident language in their briefs. I would just mention to you that less stridency might be more helpful. Thank you, Your Honor. Collin Page from the law firm of Berkowitz, Lickstein, Kuritsky, Giusul, and Gross on behalf of Plaintiff Barry Bowles. I think one of the things that you're referencing is my reaction in part to this case as a whole. So I've grown up in labor and employment law. It's all I've ever done. You did pretty well. Don't be so upset with the outcome. I haven't made a dollar. I haven't made dollars for attorney's fees. Be happy. Well, you know, I have a great deal of frustration with the case. So in my world, cases like this don't go to trial. They just don't. Well, every once in a while they do. Apparently they do. It's a good thing every once in a while to get them to trial. Otherwise, you'll forget how to try a case. It's rarely done in my world, actually. And then once lost, especially lost on what is a very, very difficult claim to appeal, a retaliation claim, which almost exclusively is in the discretion of the jury to determine what was the motivating factor that drove the decision here, and what was a very, under the circumstances, reasonable, judicious award that ultimately gets appealed. And the merit of the arguments on appeal, I think, is sorely lacking in a lot of respects. As you identified, there is no alleged error that occurred at trial. There was no improper instruction. There was no evidence that Walmart wasn't allowed to present. There was no misconduct by a plaintiff's counsel. There was no improper activity by the jury or in the alleged improper activity by the judge. Before you get too carried away with the level of your success, let me just ask you. Absolutely, Your Honor. Huh? Absolutely. Let me just ask you a bit. Even assuming that there was a protected activity, where is the causation? Where is the causation? Yeah, where is the causation? When did your client take leave? So he started to leave in May. Okay. He was compensated from May through October. That's correct. And according to Walmart's policy, four managers. They didn't lose a penny. They never challenged his failure to submit the proper forms. They never challenged his travel, alleged travel, when he shouldn't have been traveling, should have had his leg up. He got paid. So where is the temporal connection between his termination and his protected activity? So the temporal connection is when he tries to return, right? How does that have anything to do with his protected activity? Because he comes back and realizes, hey, which is protected activity? The protected activity was taking the leave. All right. That happened in May. But the end of it is the end of October. I just want to show you that you're so certain about your case that there are some questions in this case. I understand that, Your Honor. So keep your level of angst about the fact that you had to defend an appeal at the appropriate level. And he only started there in February. That's not true. That's not true at all. He'd been working for Wal-Mart for over 10 years. He started in the union store in February. He was assigned to the union store when he was promoted to assistant manager, correct? He started in February. Not with Wal-Mart, but, yes, in the union store. He got assigned there. You're absolutely correct. Yes. And then there was a disciplinary matter at the end of April, and a week later he's gone away. That's correct. And doesn't come back until the end of October. Sorry, to correct the record, this is a person who had been disciplined four times in the past, received promotions after every one of those disciplines. So this is not a situation where somebody is evading discipline. He's been disciplined, shown a record of success and ability to learn from a corrective action. Sounds like a pretty good company. Sounds like a pretty good company. I think we have some bad actors. We have a store manager that clearly was unhappy about him going out on leave. He had asked before he started in the union store, he had asked for that week off, the week in June, for he and his wife to go to Florida for our anniversary. Right. Candidly, it's very common for people to ask for vacation in the summer. I understood, but it was turned down because three people were going to be out that week, and they couldn't let the fourth go. Right. All right. And there was no issue with that. Right. So what you were pointing to was a coincidence. Now, if he had gotten cancer, that wouldn't be something he created, and certainly he didn't create a large blister on his leg and a ulcer that left him. No, the blister on his leg, of course he didn't create it, but it was his wife who noticed it. That's correct. And apparently the terminology changes because it's called a blister until the doctor, you know, treats it. Until the doctor punctures it. Then it becomes an ulcerative. But, yes, it was a blister, as the doctor referred. Which is effectively a large open wound, and what the doctor was treating was a large open wound. And as the doctor testified, and there was no adverse expert by Wal-Mart, large open wounds on the leg have a tendency, especially in heavy people, to take a long time to heal because the circulation in that area is poor. It is bad. She thought he'd be back at work in two weeks if he kept his leg elevated and rested. Which he didn't do. We're assuming he did. Even he concedes that he wasn't as good as he could have been. Right. And he's normal. He's human, right? Because very few people in this world fully comply with everything their doctor says. And I don't think it's a good idea to kind of get into the second guessing in that sort of situation. There can be active noncompliance, which might create an issue, but there's no evidence of that here. There is some evidence of lack of compliance, but he's human. All right. Why was... Let's talk about the punitive damages question a second. Sure. Why was his conduct egregious? Well, I think the things that the jury keyed in on were sort of blatant lies that were being told to them. How do you know that? I don't. I'm speculating as to what the jury found egregious, but I think I'm in a good position to say what are the most egregious things that Walmart did. Because I was at a trial. I was the one that raised them. I saw how the witnesses reacted at the time. That's what I'm asking you. Don't tell me about the jury. Tell me about what Walmart did. The egregious actions were Claude McDonald, the regional HR manager. His claim, adamant claim, that multiple people had attempted to contact Barry Bowles to warn him that his leave had expired and that he needed to come back. There's only one number that Walmart ever called him on. It was on his cell phone. We had the cell phone records. There were no calls. Walmart never produced anyone at trial to say, yes, I'm the one who made the calls. No one came to testify. They made the calls. And he called McDonald three times, correct? He called McDonald multiple times, and McDonald acknowledged that he had received text messages from Barry Bowles. Now, he claimed that they didn't give updates about his medical care and when he was coming back. Bowles claimed that he did. It's reasonable for the jury to believe that the reason he's texting McDonald is to tell him what's going on with his leave. But is this egregious or is this kind of in the category of, you know, stuff happens? I think it is egregious because it's a blatant lie. It's really an attempt to conceal. Isn't what you're complaining about the explanation as opposed to the conduct? No, no, absolutely not. Because you're saying they contacted him in October. You're saying there's no phone calls. You're saying we have a gotcha. But the bottom line is he kept getting paid in October. Kept getting a paycheck. That's correct. He had leave all the way through the end of October. He comes back to work on October 24th and gets this mysterious computer shut down. I got to worry about myself because mine was shut down yesterday. But, you know, that's frustrating. So, you know, the computer gets shut down. You're not defending your job. I'm not. And then three days later he gets a letter. I mean, how is that egregious? It seems like they treat it pretty fairly. It has to be especially egregious, not just egregious. Well, it's just the concealment of the conduct. So what a jury can reasonably infer from what happened is that the store manager was pissed that Barry was out so long. He wanted to get somebody else. He had exhibited in an e-mail that he had animus towards Barry being out so long. Well, that's the way it is portrayed. But to me it's a reasonable question. Why are we not terminating someone who is out for a couple months when we need somebody to be there overnight to do the job? And the answer is because we have a policy and there's a law that protects him. Oh, okay, thank you. But it's portrayed as I want to terminate this guy and I'm going to get him no matter what. Well, the problem is the store managers receive a fair amount of training in the actual laws and rights related to employee relations and the leaves that people are entitled to. So the idea that this guy doesn't know that leaves are available to employees for medical conditions isn't really fair. They deal with this all the time. There are hundreds of people that work in stores. There are people who are constantly on leave. It is simply a fact of life for employers. Although the perception might have been that this was not really a disability. You know, he's got a sore on his leg. Right, but that's the point. The store manager isn't the one who's receiving the medical documentation. That's why they have a corporate leave group that's administering these leaves. So there's evidence of animus. There's no evidence of any attempt to warn. There's active concealment of what actually occurred. So the jury had a reasonable basis to believe and find that Walmart was deliberately lying to them. And, you know, I hate to leave things at counsel's feet, but counsel effectively dared the jury to award punitive damages after there was an award of retaliation, which is a problem. Most employers are going to say, and most employment counselors are going to be apologetic. Counsel wasn't. They basically said the only reason we're here is a plaintiff wants more money. That's a strategy call that I think was extraordinarily foolish under the circumstances, but it's something that Walmart could be held responsible for, and there was sufficient evidence for a jury to find. Let me ask you a question. Because clearly the jury did find. Judge Fisher talked about his computer going down. Is that the word you used? Yeah. Because I don't know this. I would bet that Judge Fisher immediately sought an accommodation to get him through the next 24 hours. Now, why did not Mr. Bowles ever seek an accommodation for light-duty work, for example? To light-duty work, for example. He sought no accommodation at all. Well, first of all, leave is a form of accommodation, so asking for leave is a request for accommodation. That's absolutely clear under the case law. He was told it could be light-duty initially, but he never asked Walmart. So Walmart, as an employer, has the opportunity to engage in an interactive process. So if Walmart was paying him and they had a reasonable leave that he could work, which might have been something that they could have done based on the doctor's certification. So the doctor certifies to a need and makes a request, a recommendation. Now, doctors tend to be conservative, right? They're going to request the thing that they think most likely promotes healing. But Walmart could have taken a look at the certification and come back. I'm asking you why he did not request. It's not his obligation to do that. The employer, because of this interactive process. I'm not suggesting it's his obligation. I'm just asking why. Because his doctor told him to stay home and rest his leg. He didn't do that. But he didn't do that. He didn't do that. He wasn't fully compliant. Stuff happens. Absolutely not. If we don't find that there is enough of a temporal connection between his protected activity and his termination, do you lose? I don't think it would be appropriate for this court to even engage in that inquiry. That was not my question. I understand. If you found, then of course I would lose. But it wouldn't be proper for you to do so. The proper thing to look for is whether or not a reasonable jury could do that. You're not supposed to be deciding the facts here. Two different judges on the district court that aren't particularly sympathetic to plaintiffs already found that there was sufficient evidence for this matter to go to a jury. A properly constituted and properly instructed jury already found that there was sufficient evidence to meet our obligation to prove by a preponderance of the evidence. This issue has been decided three times already, and Walmart has lost all three times. How many chances did they get? All right, Mr. Page. Do you want any discussion of the fee issue? I think we understand your position. I would say just one thing. I'm sorry, and I know I'm going over my time. The limited success cases are really nominal award cases. All of the cases Walmart has cited involve small awards, 10,000, 20,000. If that had been the award, they would have absolutely every basis to make the argument they're making. No court has found that an award of this size is limited success or a nominal award. Thank you. Okay. Thank you, Mr. Page. Mr. Hammarish. Thank you, Your Honors. I'd like to address briefly Judge Barry, your, I think, last question, which had to do with why Mr. Bowles didn't request himself light duty. And I would respectfully, just frankly, disagree with Mr. Page's response, which is that it wasn't his obligation. If you may recall, Mr. Bowles asserted a accommodation claim, which was dismissed on summary judgment precisely because he didn't request himself that accommodation. I think it was on a slightly different accommodation than I believe as a whole. But I think your question goes precisely to the broader point that the onus here was on Mr. Bowles to request light duty, if he could do that, although that's not the issue we're raising on the appeal. But the issue we are raising has to do with the leave. The onus was on him to request leave beyond the September 10th date that he asked for, the extended date of the 29th that Walmart granted him. On the causal link issue, which you raised, Judge Fisher, I think your question was exactly right. His protected activity at most was taking medical leave. That started in May. He formally requested it in writing in July, and it ended in September. And if you look at plaintiff's brief and I think their case at trial, the two items of evidence that they point to for that causal link are the Sechalski e-mail in July, which I think, Judge Rendell, you pointed out is really a request for guidance. But in any case ‑‑ It could be taken different ways. It could be taken different ways, but it preceded. First of all, it was caught short immediately by Mr. McDonald, who pointed out that they couldn't do that under their policies, and that was in July in the middle of the leave, three months before he was terminated. And the second point was the timing of the letter, which perhaps goes to the egregious activity question, but I think is far disconnected temporally from the protected activity from taking the leave, and I don't think that can support a claim of a causal link, and I certainly think it can't undermine the ‑‑ sorry, doesn't support his claim that Walmart stated reason for terminating him. The job abandonment was a pretext. But that actually was the earliest time that they could do it and not have a potential problem, correct? Because if they did it while he was taking his leave and they knew he might be out until November, then they would have a problem. So you can't really say, oh, they should have done it during that time. No, but I think at a minimum there's a four‑week gap between September 29th or September 30th when he doesn't return for work and October 27th or 28th. But you do have McDonald and Brown testifying in deposition and trial that we knew he might be out until November, so there wasn't any pushback. I think, but again, I think that doesn't go to the question of whether or what was the protected activity and whether the Walmart's actions, there's a causal link between the protected activity and the Walmart's actions. Just briefly on the punitive damages issues, I agree, of course, as it set forth in my brief, that Walmart's actions in this case weren't blatant. I could speculate about why the jury awarded damages, but I don't think ‑‑ punitive damages, but I don't think that serves a useful purpose here. I think the evidence did show that Walmart attempted to contact him, but more importantly, I think the evidence was clear at trial that he didn't attempt to contact Walmart until after he already hadn't returned from leave. He put in a few calls to Mr. McDonald, but admits that he didn't leave a message or say anything about medical leave. The only thing he mentions is his father's death, I think, on October 3rd or 4th. And then I think the other critical issue is that the only evidence presented at trial for punitive damages related to Mr. Sochowski, the store manager, and Mr. McDonald, who I believe is the market human resources manager, which covers a half dozen stores or so, but the evidence was clear that neither of them had the authority to terminate them. That happened at the higher level, which plaintiff just admitted all this had to go through, that there's a corporate center that reviews the ‑‑ that administers the leave policy, and that's the same corporate center that the evidence was clear at trial would make the decision about terminating him. Was that argument made below that they weren't ‑‑ they couldn't effectively ‑‑ I believe that was made at all levels, although I don't have citations for that before me. Thank you. All right, Mr. Hammermich, thank you very much. And we thank counsel for their arguments in this case, and we'll take the matter under advisement. Thank you.